UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————

EUGENIA SPENCER,

                    Plaintiff,

                                                    Opinion and Order
          -against-                                 06 CV 2852 (KMW)

THE CITY OF NEW YORK (including THE
BOARD OF EDUCATION OF THE CITY OF
NEW YORK); JAMES PHILEMY, ILYSSA
MANDELL, and JOHN and/or JANE DOE(S),
each in their official and individual capacities,

                    Defendants.
————————————————————————

WOOD, U.S.D.J.:

          After a five-day trial, a jury found James Philemy and Ilyssa Mandell

(collectively "Defendants") liable for violating Eugenia Spencer's First Amendment rights

by giving her unsatisfactory employment ratings in retaliation for speech that Spencer

made as a citizen on matters of public concern.  Pursuant to Federal Rule of Civil

Procedure 50 ("Rule 50"), Defendants move for judgment as a matter of law, on the

grounds that they are entitled to qualified immunity.  Pursuant to Federal Rule of Civil

Procedure 59(a) ("Rule 59(a)"), Spencer moves for a new trial on damages, on the grounds

that the damages verdict was against the weight of the evidence.  For the reasons stated

below, both Defendants' motion for judgment as a matter of law and Spencer's motion for

a new trial are DENIED.  Spencer's requests for equitable relief and an award of prejudgment interest are GRANTED.

## BACKGROUND

### I.  Factual Background

In the summer of 2003, the regional DOE superintendent appointed Philemy to be Interim Acting Principal of PS/IS 208 ("the School"), a new school in Queens County, New York.  Philemy chose Mandell to be one of the School's two Interim Acting Assistant Principals.  Beginning in October of 2003, Spencer worked as a substitute teacher at the School.  On November 18, 2003, Philemy nominated Spencer to become a "permanent substitute" teacher of seventh-grade math.

In December of 2003, one of Spencer's male students (the "Student") began to sexually harass her.  The Student's behavior towards his classmates and towards staff led Spencer to worry about her own safety, as well as the safety of other students and teachers.  Spencer reported the foregoing concerns to her supervisors and to her union.  Spencer also filed a complaint with the New York Police Department and ultimately turned to the New York City Law Department for assistance.  The Student was arrested at school and ultimately found guilty of sexual harassment and sexual abuse.

Until these events commenced, Spencer had always received "satisfactory" performance evaluations from her supervisors in the DOE.  Beginning the day after Defendants learned that Spencer had filed her first police report, Defendants began a series of informal and formal observations that culminated in an "unsatisfactory" performance rating for the year.

### II.  Procedural History

-2-

On April 12, 2006, Spencer filed a complaint against Philemy, Mandell, the City of New York, and the Department of Education ('DOE') alleging violations of 42 U.S.C. § 1983, as well as breach of contract, negligence, and intentional infliction of emotional distress.  (Dkt. No. 1.)  On May 30, 2007, this Court granted Defendants' motion to dismiss the breach of contract claim, the negligence and intentional infliction of emotional distress claims against the DOE, and all claims against the City of New York. *Spencer v. City of New York*, No. 06 Civ. 2852, 2007 WL 1573871 (S.D.N.Y. May 30, 2007).

At the summary judgment stage, the Court dismissed the remaining negligence and intentional infliction of emotional distress claims but denied Defendants' motion to dismiss the First Amendment retaliation claim brought against Philemy, Mandell, and the DOE.  (Dkt. No. 67.)  The Court found that Spencer's communications with the Defendants and with her union did not constitute speech protected by the First Amendment because she was not speaking as a citizen but instead as an employee, in furtherance of her professional responsibilities.  *Id.* at 8-11.  The Court found that Spencer's communications to the police and to the New York City Law Department did merit First Amendment protection because that speech was made as citizen and because it addressed matters of public concern.  *Id.* at 11-16.  Whether there was a causal connection between Spencer's speech and the Defendants' adverse employment decisions was a factual issue that had to be decided at trial.  *Id.* at 16-18.  The Court also found that there were factual issues as to the Defendants' retaliatory motive or intent and that these factual questions had to be resolved by a jury before the Court could determine whether the Defendants were entitled to qualified immunity.  *Id.* at 21-22.

### III. Trial and Jury Verdict

Trial began on July 18, 2011.  Spencer, Philemy, and Mandell all testified, as did Crystal Bonds, a teacher who worked as an instructional coach for math teachers in PS/IS 208.

Spencer testified that, on December 1, 2003, the Student began to sexually harass her.  Spencer's uncontradicted testimony established that this Student on different occasions called her his "wife," snuck up behind her and rubbed his genitals against her, and fell onto her and groped her breasts.  (Trial Tr. at 426-34 July 20, 2011.)  Spencer reported the Student's sexual harassment and abuse to Mandell and filled out three incident report forms describing the harassment.  (*Id.* at 366-67; Pl.'s Ex. 52, 53, 54.)

Spencer also testified that the Student repeatedly disrupted class and threw objects at other students.  (Trial Tr. at 457-60 July 20, 2011.)  A number of other teachers brought to the attention of the Defendants the behavioral problems of this particular Student, which they felt disrupted the learning environment at the school.  (*Id.* at 362-63.)  Teachers also organized a meeting and shared with Philemy their concerns about safety issues relating to this Student.  (*Id.* at 457:1-3.)

On December 22, 2003, Spencer discovered that her wallet was missing and suspected that the Student had stolen it.  The Student eventually led Spencer to a location on school property where the wallet had been hidden.  Spencer filed a police report and also filled out one of the School's incident report forms.  (Pl.'s Ex. 55, 57.)  The Student was suspended, but when he returned to her class, Spencer testified that "he became more belligerent than ever, getting up out of his seat, cursing out loud, throwing objects at other students." (Trial Tr. 456:8-10 July 20, 2011.)

Spencer called the police again, she said, "because his behavior had become more intimidating and I was fearful." (*Id.* 460:15-16.)  Spencer testified that she "was concerned about the students' safety as well as the teachers', and his behavior issues had now become the focus of the class and it was interrupting the learning process." (*Id.* at 460:19-22.)

As a result of Spencer's call to the police, the Student was subsequently arrested at the school.  After the Student's arrest, the Defendants permitted the Student to return to Spencer's classroom where the Student continued his disruptive and harassing behavior.  Spencer continued to seek support from the Defendants by filling out student removal forms describing the Student's behavior.  (Pl.'s Ex. 61, 62.)

Spencer then turned to an Assistant Corporation Counsel in the New York City Law Department for help.  The Law Department brought an action against the Student in New York State Family Court.  On April 8, 2004, an order of protection was issued in favor of Spencer and against the Student.  (Pl.'s Ex. 41.)  The Student was subsequently removed from Spencer's class.  After a fact-finding hearing, the Family Court found the Student guilty of one count of harassment in the first degree and three counts of sexual abuse in the third degree.  (Pl.'s Ex. 48.)

Spencer had taught in DOE schools from 2000 to 2003 and had received "satisfactory" performance evaluations from all of her supervisors.  (Trial Tr. at 399-405 July 20, 2011.)  The day after Philemy first learned that Spencer had filed a police report, Philemy conducted an informal observation of Spencer's class and rated Spencer's employment performance "unsatisfactory." (Trial Tr. 84:18-25 July 18, 2011.)  On April 19, 2004 Philemy conducted a formal observation of Spencer's class.  He did not write up the report of that April observation until June 30, 2004, at which point he concluded that

it too was "unsatisfactory." (*Id.* at 110:1-8.)  On June 17, 2004, Philemy gave Spencer an

overall evaluation of "unsatisfactory" for the 2003-2004 school year.  (Pl.'s Ex. 23.)

Philemy did not attach any supporting documents to substantiate the rating.  (Trial Tr.

142:17-143:10 July 19, 2011.)

 Spencer also testified to a motive for the retaliation that she alleged, specifically

concern by Philemy and Mandell that Spencer's complaints were giving the school, and

the Defendants' management of it, a bad reputation.  Spencer testified that at one point

when another teacher called 911 with regard to a student, Mandell was upset because

"[s]he did not want it to be known that the school is a crime school, that events like this

was happening, and that Mr. Philemy would not be happy to hear that." (Trial Tr. 420:5-7

July 20, 2011.)  With regard to another incident in which school police were called to

respond to the Student's disruption, Spencer testified that Mandell reiterated "that Mr.

Philemy did not want the school to be known as a crime school." (*Id.* at 475:19-20.)

 Defendants' testimony primarily sought to establish reasons for which it could

have been reasonable to have given Spencer an unsatisfactory rating.  (e.g., Trial Tr. at

202-07 July 19, 2011.)  Philemy testified that he believed Spencer displayed a lack of

professionalism in her interactions with parents and supervisors and also that he saw

Spencer's responses to the theft of her wallet and to the actions of the Student as

inappropriate for the school context.  (*Id.* at 215.)  Philemy testified that if all of Spencer's

interactions with the Student were removed and her contact with the police and the Law

Department were ignored, "I think she still would have gotten a U" because "she wasn't in

compliance [with DOE expectations] and she wasn't improving." (*Id.* 216:23-24; 217:3-4.)

Mandell testified regarding her efforts to improve Spencer's teaching and also her

impression of Spencer's inappropriate interactions with Philemy and with parents. (Trial Tr. at 371-75 July 20, 2011.)

After Spencer rested her case on July 21, 2012, Defendants moved for a judgment as a matter of law pursuant to Rule 50, and the Court reserved judgment. The jury found that Spencer's protected speech was a substantial or motivating factor in Philemy and Mandell's "unsatisfactory" rating of Spencer for the 2003-04 school year. The jury also found that the Defendants would not have given Spencer an "unsatisfactory" rating in the absence of Spencer's protected speech. Finding that the "unsatisfactory" rating for the 2003-04 school year interfered with Spencer's ability to obtain full-time employment with the DOE, the jury awarded Spencer $25,000 in damages. The jury did not find that the "unsatisfactory" rating prevented plaintiff from obtaining other employment and did not award punitive damages or damages for emotional pain or distress.

### IV. The Current Motions

Defendants now move for a judgment as a matter of law, on the grounds that Philemy and Mandell are entitled to qualified immunity. Defendants argue that it was not clearly established that Spencer's actions constituted protected speech and that it was objectively reasonable for Mandell and Philemy to believe that their actions did not violate Spencer's rights. Spencer moves for a new trial with regard to damages, arguing that the jury's award is not supported by the weight of the evidence.

### DISCUSSION

### I. Judgment as a Matter of Law on the Basis of Qualified Immunity

#### A. The Legal Standard for a Motion for Judgment as a Matter of Law

In considering a motion for judgment as a matter of law pursuant to Rule 50,[1] the district court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . . Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000); *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007). The court "must give deference to all credibility determinations and reasonable inferences of the jury." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008). A court may grant a motion for judgment as a matter of law only if, viewing the evidence in the light most favorable to the non-moving party, it can conclude that "a reasonable juror would have been compelled to accept the view of the moving party." *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011); *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993). Defendants seek a judgment as a matter of law that they may not be held liable because they are entitled to qualified immunity as government officials.

## B.  The Legal Standard for Qualified Immunity

Although the text of 42 U.S.C. § 1983 does not provide for immunities from suit, courts have read the statute "in harmony with general principles of tort immunities" to provide qualified immunity for many government officials.  *Malley v. Briggs*, 475 U.S. 335, 339 (1986); *Nagle v. Marron*, 663 F.3d 100, 113 (2d Cir. 2011). "Qualified immunity balances two important interests—the need to hold public officials accountable

---

[1] Rule 50 provides that:
If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Filarsky v. Delia*, 132 S.C. 1657, 1660 (2012); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).

The doctrine of qualified immunity provides that government officials performing discretionary functions generally are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011) (quoting *Harlow*, 457 U.S. at 818). Qualified immunity is not just a defense to liability but an immunity from suit altogether. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotations omitted).

In *Saucier v. Katz*, the Supreme Court established two questions a court must consider when evaluating qualified immunity. 533 U.S. 194, 201 (2001). First, "do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* Second, was that right "clearly established" at the time that the conduct occurred? *Id.*; *see also Nagle*, 633 F.3d at 114. In *Pearson*, the Court held that "the *Saucier* protocol should not be regarded as mandatory in all cases," but emphasized that nonetheless considering these questions in this order "is often beneficial." 555 U.S. at 236.

The answer to each of these questions depends on the state of the law regarding retaliation against public employees for exercising their rights under the First Amendment, to which the Court now turns.

### C. First Amendment Retaliation

Although "the government enjoys significantly greater latitude when it acts in its capacity as employer than when it acts as sovereign, the First Amendment nonetheless prohibits it from punishing its employees in retaliation for the content of their protected speech." *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001); *see also Waters v. Churchill*, 511 U.S. 661, 671-72 (1994).  In interpreting the First Amendment rights of public employees, the Supreme Court has sought a "balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  The Court has recognized that government employees "may have a strong, legitimate interest in speaking out on public matters" and that "public debate may gain much from their informed opinions." *Waters,* 511 U.S. at 674.  It has also recognized the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick v. Myers*, 461 U.S. 138, 143 (1983).

Thus, the "First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," but a public employee must also "accept certain limitations on his or her freedom" in the case of speech that may "contravene government policies or impair the proper performance of governmental functions." *Garcetti v. Ceballos*, 547 U.S. 410, 417-19 (2006).  To succeed

in a claim of First Amendment retaliation, a plaintiff must prove that: (1) she engaged in constitutionally protected speech because she spoke as a citizen on a matter of public concern; (2) she suffered an adverse employment action; and (3) the speech was a motivating factor in the adverse employment decision.  *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006).  Prior to trial, this Court found as a matter of law that Spencer's speech was made as a citizen on a matter of public concern.  (Dkt. No. 67.)  Defendants did not contest that the year-end "unsatisfactory" rating Spencer received was an adverse employment action.  Considering all the evidence presented at trial, the jury found that Spencer's protected speech was a substantial or motivating factor in the "unsatisfactory" rating Spencer received for the 2003-04 school year.  Further, the jury concluded that the Defendants would not have given Spencer an "unsatisfactory" rating in the absence of Spencer's protected speech.

Defendants now move the Court to find either that the evidence presented did not demonstrate that the Defendants' conduct violated a constitutional right, or, in the alternative, that the right violated was not "clearly established" at the time that the conduct occurred.

### D.  The Qualified Immunity Analysis

#### 1. Existence of a Constitutional Violation

Defendants argue that Spencer's speech was not speech on a matter of public concern, and that therefore there was no constitutional violation.  The evidence presented at trial further reinforced the Court's prior holding that Spencer's speech was made as a citizen and on a matter of public concern, and therefore was protected.

#### a. Speech as a Citizen

In order for her speech to be protected under the First Amendment, a public employee must speak as a citizen, rather than pursuant to her official duties. *Garcetti*, 547 U.S. at 421 (2006) ("[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."); *see also Weintraub v. Bd. of Educ.*, 593 F.3d 196, 201 (2d Cir. 2010).  In *Garcetti*, the Court endorsed a "practical" framework for determining when a public employee engages in speech pursuant to her official duties.   547 U.S. at 424-25. Specifically, courts must examine whether the speech at issue is part of what a plaintiff "was employed to do," and whether it "owes its existence to a public employee's professional responsibilities." *Id.* at 421.  Courts may also consider whether there is a "relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

This Court found that Spencer's complaints to her supervisors, the incident reports that she filed with the school, and the grievance that she filed with her union with regard to the Defendants' management of school discipline issues all constituted speech "in furtherance of" her employment responsibilities and thus did not constitute speech as a "citizen." (Dkt. No. 69. at 8, quoting *Weintraub*, 593 F.3d at 202.)  In contrast, Spencer's speech to the police and the case that she brought in New York Family Court were not in furtherance of her employment responsibilities.  Spencer's speech to the police and to the court was not "part-and-parcel" of her concerns about her ability to "properly execute her duties" and maintain classroom discipline. *Weintraub*, 593 F.3d at 203.  Instead, her speech related to issues of sexual harassment and sexual abuse and to her concerns for her safety both on and off school grounds and her fears for the safety of other students, other teachers, and the public.  This speech was outside the course of her official duties,

and it was not only analogous to, but effectively the same as, speech regularly engaged in by citizens who are not government employees.  *See Jackler*, 658 F.3d at 237-38, 239. The Court thus held that the communications with the police and with New York Family Court were speech Spencer made as a citizen.

<u>b. Speech on a Matter of Public Concern</u>

Finding that Spencer spoke to the police and to the New York Family Court "as a citizen," the Court then considered whether Spencer spoke "on a matter of public concern." (Dkt. No. 69. at 8, quoting *Garcetti*, 547 U.S. at 418). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 131 S.Ct. 1207, 1216 (2011) (internal quotations omitted).   By contrast, an "employee who complains solely about [her] own dissatisfaction with the conditions of [her] own employment is speaking upon matters only of personal interest." *Sousa v. Roque*, 578 F.3d 164, 174 (2d Cir. 2009) (internal quotations omitted); *see also Lewis v. Cowen*, 165 F.3d 154, 163-64 (2d Cir. 1999).

Whether speech is of public concern is a question of law to be determined based on the "content, form, and context of a given statement, as revealed by the whole record," and no single factor is dispositive.  *Jackler*, 658 F.3d at 235 (quoting *Connick*, 461 U.S. at 147-48).  Rather, courts must "evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder*, 131 S.Ct. at 1216 .

Regarding content, Spencer's speech addressed persistent safety issues and discipline problems in a public school, and included an implicit allegation that the school

administration failed to respond effectively.  Spencer's speech also brought to external agencies allegations of sexual harassment and sexual abuse in school, allegations that were later found to beyond a reasonable doubt to be true after a fact-finding hearing by a New York State Court.  (Pl.'s Ex. 48.)  Issues such as sexual harassment and sexual abuse in schools, and the extent to which school administrators maintain a safe environment for teachers and students, do relate to matters of political and social concern to the community.  *Cf. Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 164 (2d Cir. 2006) ("The incident [of sexual assault of a student on school property] itself, the deficiencies in adult supervision that allowed it to occur, and the possible insufficiencies of the school's response implicate the health, welfare and safety of young students, all of which are matters of importance to the public.").

Regarding form, Spencer's communications took the form of reports to the police and conversations with the New York City Law Department and Family Court.[2]  Spencer did not broadcast her communications to the public at large.  But her First Amendment rights are not contingent upon the size of the audience to which she spoke.  *See Id.* at 165; *see also Rankin v. McPherson*, 483 U.S. 378, 386 n.11 (1987) ("The private nature of the statement does not . . . vitiate the status of the statement as addressing a matter of public concern.").  Instead, Spencer directed her speech to public entities outside the institutional context of her employment and these communications resulted in those public entities

---

[2] The brief summary listed on the police report from Spencer's first complaint to the police on December 29, 2003 lists only her complaint about the theft of her wallet.  (Pl.'s Ex. 55.)  The complaint thus appears to concern a purely private matter.  When Defendants raised this issue on cross-examination, Spencer testified that she also described the Student's sexual harassment and his assault to the police but that it was not the main focus of her complaint because she was most concerned that the Student now had her license with her home address on it. (Trial Tr. at 612-13 July 21, 2011.)  The Court need not determine the extent to which Spencer's testimony demonstrates a broader relevance to her initial police report because her subsequent communications addressed more issues than just the theft of her wallet and occurred in a context supporting shared concerns about safety at the school.

taking official action, including criminal charges.  *See Ross v. Lichtenfeld*, 755 F. Supp. 2d 467, 474 (S.D.N.Y. 2010) (Young, J.).  Although Spencer did not hold a press conference or write a letter to the editor of a newspaper, Spencer's speech to the police and communications with the Law Department and Family Court made her concerns public, and the form of her speech thus lends support to a finding that her speech was on a matter of public concern.

Regarding context, testimony from all of the parties at trial established that Spencer was not alone in her concerns about safety and about the Student's repeated sexual harassment and abuse.  (e.g. Trial Tr. 457:1-3; 475:12-14 July 20, 2011.)  Philemy and Mandell both admitted that they had received complaints about this particular Student on multiple occasions.  (Trial Tr. 117:25-118:3 July 18, 2011; Trial Tr. 361-65 July 20, 2011.)  After Spencer's first communication with the police, the sixth- and seventh-grade teachers convened a meeting to share with Philemy their concerns about safety issues in the school and regarding this particular Student.  (Trial Tr. at 456-57 July 20, 2011.)  Mandell also testified that another female teacher had complained to Mandell that the same Student had 'bumped' into her.  (*Id.* at 379:19-23.)  Presumably that teacher raised the issue with the assistant principal only because she felt there was something extraordinary and inappropriate about the contact, otherwise it would not have merited mentioning.

Spencer called the police again on January 21, 2004, because of the Student's belligerence and disruptiveness and because she 'was concerned about the students' safety as well as the teachers'.'' (*Id.* 460:19-22.)  As a result of this phone call, the police came to the school and arrested the Student.  (Trial Tr. 619:20-24 July 21, 2011.)  In this

communication with the police, Spencer mentioned the theft as well as the sexual

harassment and abuse, and this complaint led to the case brought in New York Family

Court.  Spencer also testified that the Student was suspended a second time because he

assaulted another student and made a threat that there was a bomb at the school.  (*Id.* at

470.)  The context in which Spencer communicated with the police, the Law Department,

and the Family Court was thus one where teachers' concerns about safety were pervasive,

and further supports a finding that her speech was on a matter of public concern.

Defendants nevertheless urge the Court to focus on Spencer's motive and find it

determinative.  (Defendants' Memorandum of Law in Support of Rule 50 Motion ("Defs.'

Mem.") at 2.)  An important factor in determining whether a public employee's speech

addresses a matter of public concern is whether that employee's speech was "calculated to

redress personal grievances or whether it had a broader public purpose." *Hoyt v.*

*Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006).[3]  However, a "speaker's motive, while one

factor that may be considered, is not dispositive as to whether [that] speech addressed a

matter of public concern." *Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).[4]

---

[3] The Second Circuit's "previous cases suggesting that the speaker's motive might indicate that the speech is not on a matter of public concern have focused primarily on private motives related to employment grievances." *Reuland*, 460 F.3d at 417; *see e.g., Ezekwo v. N.Y.C. Health & Hosp. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (finding that the speech at issue was not a matter of public concern because both the motive of the speaker and the content of the speech were related to personal grievances); *Ruotolo v. City of N.Y.*, 514 F.3d 184, 189 (2d Cir. 2008) (finding that a lawsuit alleging First Amendment retaliation did not itself constitute speech on a matter of public concern); *see also Jackler*, 658 F.3d at 236 ("Speech that, although touching on a topic of general importance, primarily concerns an issue that is 'personal in nature and generally related to [the speaker's] own situation,' such as his or her assignments, promotion, or salary, does not address matters of public concern." (quoting *Ezekwo*, 940 F.2d at 781)).

[4] Defendants rely on *Storman v. Klein*, No. 09 CV 0338, 2009 WL 1035964 at *21 (S.D.N.Y. Apr. 20, 2009) (Peck, M.J.) to support their claim that Spencer's speech was purely personal, but the facts in *Storman* diverge widely from the facts here.  The plaintiff in *Storman* alleged that his appeal of his unsatisfactory rating and his subsequent lawsuit *themselves* constituted speech on a matter of a public concern.  Such an argument is clearly circular, and the court in *Storman* held that the plaintiff's appeal of his unsatisfactory rating and his lawsuit challenging his unsatisfactory rating "did not seek to advance a public purpose" and "did not constitute speech on a matter of public concern." *Id.* at *21.  Spencer did not allege that filing a lawsuit challenging her unsatisfactory rating is the speech on a matter of public concern that led to the retaliation, as the plaintiffs did in *Ruotolo* and *Storman*.  Instead, Spencer alleged, and the

-16-

Spencer's testimony established that she did not act for purely personal reasons.  Spencer testified that she contacted the police on the second occasion both to address the disruption that the Student's actions were causing in class and also because she "was concerned about the students' safety as well as the teachers".[5]  (Trial Tr. 460:19-22 July 20, 2011.)  Spencer's complaints implicated a school-wide problem that affected the safety of students and of other teachers and her trial testimony stated that she had at least a dual motive in bringing these complaints, further supporting her claim that the speech addressed a matter of public concern.

Taken together, the content, form, and context of Spencer's speech confirm the Court's prior holding that the speech addressed a matter of public concern.

Spencer's speech, then, was made as a citizen on a matter of public concern.  The jury found that it was in retaliation for this speech that Defendants made employment decisions adverse to Spencer, and that, but for Spencer's protected speech, she would not have received the year-end unsatisfactory rating.  Defendants' conduct therefore violated Spencer's constitutional rights.

## 2. Clearly Established Law

Even though Defendants' conduct violated Spencer's constitutional rights, they may nevertheless be entitled to qualified immunity if the right that they violated was not clearly established.  The "dispositive inquiry in determining whether a right is clearly

---

jury found, that her unsatisfactory rating was made in retaliation for complaints to the police and to the New York City Law Department in response to sexual harassment and sexual abuse at a New York City public school, which do address a matter of public concern.  Defendants' reliance on *Hodge v. City of Long Beach*, No. 07 CV 4084, 2010 U.S. Dist. Lexis 1383344 at *54 (E.D.N.Y. Dec. 28, 2010) (Pratt, J.), is similarly misplaced, as its narrow holding is that "allowing the mere filing of a lawsuit . . . to fulfill the public concern requirement without more would so dilute the rule as to render it meaningless."

[5] Defendants argue that "plaintiff's naked assertion that this was her intent cannot convert a personal grievance into an issue of public concern."  The Court does not rely on Spencer's testimony alone, but considers the content, form, and context of her speech, as well as her testimony at trial.

established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *Nagle*, 663 F.3d at 114.  Courts must consider the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson v. Layne*, 526 U.S. 603, 614 (1999) (internal quotations omitted).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope v. Pelzer*, 536 U.S. 740, 739 (2002) (internal quotations omitted); *see also Scott v. Harris*, 550 U.S. 372, 377 (2007). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Pelzer*, 536 U.S. at 739 (citations omitted).

To determine whether a right is clearly established, courts consider "(1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question[;] and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010).

In 2004, when the adverse employment actions in this case began, the prohibition against adverse employment actions in retaliation for the exercise of constitutional rights was already clearly established with reasonable specificity.  *See Jackler*, 658 F.3d at 243. In 1968, the Supreme Court made clear that a "teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." *Pickering*, 391 U.S. at 574.  Although courts have modified some of the

contours of that prohibition in the ensuing decades, the core of the constitutional mandate against retaliatory adverse employment actions has remained consistent.  *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 681 (1994); *Perry v. Sindermann*, 408 U.S. 593, 598 (1992).  Indeed, as the Second Circuit stated in 2002 in reference to retaliation against public employees for the content of their speech on matters of public concern, an "employee's right to be free from such retaliation has been clearly established since at least 1968." *Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002).

In her testimony, Spencer described how Mandell was upset when 911 was called because Mandell and Philemy were both concerned that incidents involving emergency services would give the new school a reputation as a "crime school." (Trial Tr. 420:1-7 July 20, 2011.)  Defendants' case rested largely on the assertion that they would have given Spencer an "unsatisfactory" rating regardless of the speech at issue in the trial.  The jury, however, found that the Defendants would not have given Spencer an "unsatisfactory" rating in the absence of Spencer's protected speech.  In other words, the jury found by a preponderance of the evidence that the adverse employment decisions made by Philemy and Mandell were made in retaliation for speech Spencer engaged in that was protected by the First Amendment.

Where, as here, a "specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Reuland*, 460 F.3d at 419 (quoting *Locurto v. Safir*, 264 F.3d 154, 169 (2001)).  Indeed, "no reasonable official could think that such speech-retaliatory conduct was constitutionally permissible." *Nagle*, 663 F.3d at 115.  It is clearly established that when an employer's actual motive for an

adverse employment action is the content of the employee's speech on a matter of public concern as opposed to fear about disruption of the workplace, this retaliatory action is unconstitutional. *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996).

As these repeated holdings by the Supreme Court and the Second Circuit demonstrate, the right of a public employee to be free from retaliatory employment actions based on the content of public speech is well supported by the case law. This right was defined with reasonable specificity at the time the adverse employment action in this case was taken in 2004–the Supreme Court articulated the general contours of the right in 1968 in *Pickering*, and the Second Circuit defined it with further specificity in 1996 in *Sheppard* and in 2001 in *Locurto*, among other occasions. A reasonable public official would have recognized that Spencer's public statements regarding safety issues at the School and her public reports of sexual assault within the School constituted speech on a matter of public concern. No reasonable supervisor of a public employee would believe that it was constitutional to retaliate against Spencer for exercising her First Amendment rights. Thus, under the state of the law as established at that time, a reasonable defendant would have understood that taking adverse employment action against a public employee in retaliation for her public speech about safety issues at the school was unlawful. The Court finds that the right of public employees to be free from adverse employment actions in retaliation for speech on a matter of public concern was clearly established at the time Defendants gave Spencer an unsatisfactory rating, and accordingly they are not entitled to qualified immunity. Defendants' motion for judgment as a matter of law is therefore denied.

## II. Rule 59 Motion for a New Trial on Damages

A.  <u>The Legal Standard for a Rule 59 Motion for a New Trial</u>

Rule 59(a) provides that after a court may grant a new trial "after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  Relevant in this case, a court may grant a new trial when a verdict is against the weight of the evidence.  *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).  A district court may grant a motion for a new trial only if it is convinced that the jury has reached a seriously erroneous result or that the verdict constitutes a miscarriage of justice.  *Nimely v. City of New York*, 414 F.3d 381, 392 (2d Cir. 2005).  A jury verdict should rarely be disturbed.  *Raedle*, 670 F.3d at 418.

B.  <u>Analysis</u>

After considering all of the evidence, the jury concluded that the "unsatisfactory" rating prevented Spencer from obtaining full-time employment with the DOE for a period of one year, and awarded $25,000 in damages.  The jury found that the unsatisfactory rating did not prevent Spencer from benefitting from other job opportunities and that Spencer did not prove that she suffered emotional distress as a result of the retaliation. Spencer now moves for a new trial on damages.  In support of her motion, Spencer points to her testimony about her lost salary and about the emotional distress she suffered and argues that the jury's award was unreasonable and against the weight of the evidence. (Pl.'s Reply at 4-5.)

The jury's finding that the unsatisfactory rating prevented Spencer from obtaining full-time employment with the DOE for a period of one year is amply supported by the evidence.  Spencer testified that she had previously been teaching in DOE schools on renewable one-year temporary licenses and that she did not complete the coursework

necessary to obtain a permanent license.  (Trial Tr. 525:4-9; 526:12-15 July 20, 2011.).

At the time Spencer taught at the School in Queens, Spencer was working under a

modified one-year special education license to teach math and again did not complete the

coursework necessary to obtain a permanent license.  (Trial Tr. 528:13-16 July 20, 2011.)

Further, Philemy testified that receiving a "U doesn't prevent you from getting your

[teaching] license." (Trial Trans. 665:18 July 21, 2011.)   Reasonable jurors could have

concluded that it was at least as likely that Spencer did not become a certified, full-time

teacher at the DOE because of her own decisions regarding completing the required

coursework as it was because of her unsatisfactory rating, and that the rating did not

prevent her from teaching at the DOE for more than one year.

        The trial testimony also offered evidence to support the jury's conclusion that the

unsatisfactory rating did not prevent Spencer from finding other employment.  Spencer

testified regarding her work, subsequent to the rating, as a part-time home instruction

teacher for the DOE and her part-time position with the Sylvan Learning Center, as well

as her work as an assistant chief of staff for a New York State Assemblyman (Trial Tr.

506:1-4; 508:18-22 July 20, 2011).  Spencer testified that when she was fired from her

job with the Assemblyman she believed it was because he had found out about the

unsatisfactory rating, but she also testified that she had informed the chief of staff of the

rating before she was hired and that the Assemblyman had also given a budgetary reason

for his inability to retain her on his staff.  (Trial Tr. 645:7-9, 645:23-24 July 21, 2011.)

Reasonable jurors could have concluded that the employment difficulties that Spencer

encountered after receiving the unsatisfactory rating were not directly caused by that

rating.

Spencer also testified about emotional distress she suffered as a result of the rating and physical manifestations of that distress, but the jury found that she had not demonstrated by a preponderance of the evidence that she suffered emotional pain, emotional distress, or mental anguish as a result of the retaliation. Reasonable jurors could have reached this conclusion after considering the adequacy of the limited facts connecting the emotional distress to the retaliatory action. (Trial Tr. 521:2-20 July 20, 2011.) Alternatively, the jury could have reached this conclusion after considering the credibility of Spencer's testimony on this issue. When considering whether the jury's result was seriously erroneous or a miscarriage of justice, "a court should rarely disturb a jury's evaluation of a witness's credibility." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

After reviewing the evidence, the Court cannot conclude that the jury has reached a seriously erroneous result or that the verdict constitutes a miscarriage of justice. Spencer's motion for a new trial is therefore denied.

### III. Request for Equitable Relief

A. Legal Standard for Equitable Relief

In an action alleging the deprivation of federally protected rights in violation of 42 U.S.C. § 1983, a plaintiff may seek both legal and equitable relief in federal court. *Allen v. McCurry*, 449 U.S. 90, 104 (1980). In cases involving violations of constitutional rights, the nature of the remedy is determined by the scope of the violation. *See, e.g.*, *Milliken v. Bradley*, 433 U.S. 267, 281-82 (1977). Remedies for constitutional violations should be designed to restore the victims of the violation as much as possible to the position they would have occupied in the absence of such conduct and, at the same,

time respect the role of state and local authorities in the management of their affairs.  *Id.*;
*LeBlanc-Sternberg v. Fletcher*, No. 96-6149, 1996 WL 699648, at *2-3 (2d Cir. Dec. 6,
1996).

      B.  <u>Analysis</u>

Spencer requests the conversion of her unsatisfactory performance rating for the
2003-2004 academic year into a satisfactory performance rating.  Spencer also seeks to
have the three documents upon which Defendants' based the unsatisfactory rating
expunged from the DOE files: 1) Defendant Philemy's January 6, 2004 observation; 2)
Defendant Philemy's April 19, 2004 observation; and 3) two letters regarding Spencer's
meeting with Mr. and Mrs. Hall (a May 4, 2004 letter from Defendant Mandell to
Spencer and a May 11, 2004 letter from Defendant Philemy to Ms. Martinez).  Plaintiff
argues that the change of rating and the expungement of these records will most closely
return her to the position she would be in had the Defendants not taken any retaliatory
employment actions against her.

Defendants contend that any equitable relief is unwarranted because the jury
rejected Spencer's claim that the rating interfered with her ability to obtain other
employment opportunities.   When courts design a remedy that will restore the victim of
the constitutional violation approximately to the position they would have occupied in the
absence of the conduct, however, courts cannot limit that attempt to just one particular
form of injury, but must consider the injuries as a whole.  The jury found that Spencer
would not have received an unsatisfactory rating but for the retaliatory action by the
Defendants.  The most straightforward and appropriate remedy tailored to fit the nature
and extent of the violation is therefore the conversion of the unsatisfactory rating to a

satisfactory one, together with an order that the records prepared in order to justify the rating be expunged.  Where "a constitutional violation has been found, the remedy does not exceed the violation if the remedy is tailored to cure the condition that offends the Constitution." *Milliken v. Bradley*, 433 U.S. 267, 282 (1977) (internal quotations omitted).  This simple equitable remedy most closely returns Spencer to the position she would have occupied absent the constitutional violation and is narrowly tailored to cure that violation without unduly interfering in the DOE's management of its affairs. Spencer's request for equitable relief is therefore granted.

### IV. Prejudgment Interest

In light of the jury's award of back wages, Spencer has moved for an award of prejudgment interest from 2005 until the entry of judgment, pursuant to 28 U.S.C. § 1961.  Defendants do not oppose the awarding of prejudgment interest.  (Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Equitable Remedies and New Trial, at 4.)  "[T]o the extent . . . that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest." *Sharkey v. Lasmo (AUL Ltd.)*, 214 F.3d 371, 375 (2d Cir. 2000) (internal quotations omitted).  Accordingly, Spencer's request for prejudgment damages is granted.

**V. Conclusion**

For the reasons stated above, Defendants' motion for a judgment as a matter of law is DENIED, Plaintiff's motion for a new trial is DENIED, and Plaintiff's requests for equitable relief and for an award of prejudgment interest are GRANTED.

SO ORDERED.

DATED:      New York, New York
            July 12, 2012

_____
KIMBA M. WOOD
United States District Judge